IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DANIEL W. PHOENIX,

        Plaintiff,

    v.                                   Civil Action No. 3:23cv615

HAROLD W. CLARKE, *et al.*,

        Defendants.

## MEMORANDUM OPINION

Daniel W. Phoenix,[1] a former Virginia inmate proceeding *pro se*, filed this civil action under 42 U.S.C. § 1983.[2] The action is proceeding on Phoenix's Complaint. (ECF No. 1.)[3] Phoenix names the following individuals, employed by Virginia Department of Corrections ("VDOC") as defendants: Harold W. Clarke, Dr. Mark Amonette, Steve Herrick, Darrell Miller, Jerry D. Oates, and Mrs. Harris (collectively, "Correctional Defendants"). Additionally, Phoenix

---

[1] During the course of this litigation, Plaintiff changed his last name from Jamison to Phoenix. In order to avoid any confusion, where a document refers to Plaintiff by his prior name, the quotation has been amended, without further notation, to reflect Plaintiff's current name.

[2] That statute provides, in pertinent part:

> Every person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

42 U.S.C. § 1983.

[3] The Court utilizes the spelling of Defendants' names as contained in their Motions for Summary Judgment.

The Court employs the pagination assigned by CM/ECF docketing system. The Court corrects the punctuation, capitalization, and spelling in the quotations from the parties' submissions. The Court omits any secondary citations in the quotations from, or citations to, the parties' submissions.

names the following medical personnel as defendants:  Dr. William Henceroth, Dr. Alvin Harris, Dr. Kshitij Sharma, Advanced Practice Registered Nurse ("APRN") Steven Marinos, registered nurse ("RN") Tiffany Powell, RN Jessica Schnur, and RN Latarsha Stith (collectively "Medical Defendants").[4]  Phoenix contends that the Correctional Defendants and the Medical Defendants failed to provide him with adequate medical care for his neck and back problems.  The Correctional Defendants and the Medical Defendants have filed Motions for Summary Judgment.  (ECF Nos.  87, 96.)  The Court provided Phoenix with appropriate notice pursuant *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975).  (ECF Nos. 89, 99.)  Phoenix has filed a myriad of responses.  (*See, e.g.*, ECF Nos. 94, 105–111.)

As is his practice, Phoenix has disregarded the rules and directives of the Court in responding to the Motions for Summary Judgment.  The Medical Defendants have objected to Phoenix's response.  The Court will address Phoenix's opposition to the Motions for Summary Judgment in **Section III** below, prior to turning the merits of the Motions for Summary Judgment.  Ultimately, the Motions for Summary Judgment, (ECF Nos. 87, 96), will be GRANTED.

### I.  Summary of Allegations and Claims in the Complaint

On August 3, 2019, Phoenix was transferred to Deerfield Correctional Center ("Deerfield").  (ECF No. 1 ¶ 20.)  Phoenix has "serious neck and back medical conditions." (ECF No. 1 ¶ 24.)  "[I]n February of 2020, he had the first of several MRI's showing significant injuries to his neck and back for which it was agreed upon to start treatments of physical therapy and epidural injections, but this never happened."  (ECF No. 1 ¶ 25.)  Specifically, "[a]s the

---

[4] Phoenix also names Dr. Singretti and Nurse Silvis as defendants.  These defendants have not been served.  The claims against them are addressed and dismissed at the end of this Memorandum Opinion.

Covid-19 pandemic started, Phoenix was never ordered the epidural injections and the physical therapy never happened." (ECF No. 1 ¶ 33.) "Even when the pandemic slowed, still no proper services were provided by medical staff or pain management was not given despite several complaints, grievances, and several administrative meetings." (ECF No. 1 ¶ 33.) Defendants Schnur and Harris attended these meetings "yet still did nothing to correct Phoenix's medical care." (ECF No. 1 ¶ 33.)

Despite his knowledge of Phoenix's neck and back issues, APRN Marinos "offered no pain management or help." (ECF No. 1 ¶ 35.)

In November of 2022, and again on July 11, 2023, Phoenix underwent additional MRIs. (ECF No. 1 ¶ 26.) Each of these MRIs showed "the need for surgical remedy," however no surgical appointment or other follow up occurred, which has left Phoenix "in horrible and grueling pain." (ECF No. 1 ¶ 26.)[5]

After a July 2023 appointment with a neurosurgeon, Phoenix was prescribed Lyrica for nerve pain. (ECF No. 1 ¶ 36.) Dr. Harris failed to approve the Lyrica. (ECF No. 1 ¶ 36.) Dr. Sigretti finally approved the Lyrica in August of 2023. (ECF No. 1 ¶ 36.)

Phoenix's claims for relief are hardly precise. Phoenix broadly complains:

> All actions of the defendants were willful, knowing and deliberate without the best interest of Phoenix's care in mind. The records show untimely medical care, inadequate medical care, improper medical care and medical care that does not comport with federal and state laws . . . . All of their actions, collectively and severally, led to violations of my 8th Amendment[6] rights and exposed me to cruel and unusual punishment that all stemmed from my lack of medical care for my neck and back.

---

[5] Phoenix filed his Complaint on September 27, 2023.

[6] "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII.

3

(ECF No. 1 ¶ 43.) Phoenix further charges that the Medical Defendants, among other things, failed to: provide "timely or proper medical service[s]"; provide "timely access to medical testing"; "follow the orders of the neurosurgeon"; make medical records "available for [] specialists"; and, provide "adequate pain management." (ECF No. 1 ¶ 45.)

Phoenix demands monetary damages and injunctive relief. Because Phoenix has been released from custody, (ECF No. 91), his demands for injunctive relief will be DISMISSED AS MOOT. *See Rendelman v. Rouse*, 569 F.3d 182, 186 (4th Cir. 2009) (observing that "a prisoner's transfer or release from a particular prison moots his claims for injunctive and declaratory relief with respect to his incarceration there" (citing *Incumaa v. Ozmint*, 507 F.3d 281, 286–87 (4th Cir. 2007); *Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991); *Taylor v. Rogers*, 781 F.2d 1047, 1048 n.1 (4th Cir. 1986))).

## II. Standard for Summary Judgment

Summary judgment must be rendered "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the responsibility of informing the Court of the basis for the motion and identifying the parts of the record which demonstrate the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the pleadings, depositions, answers to interrogatories, and admissions on file." *Id.* at 324 (internal quotation marks omitted). When the motion is properly supported, the nonmoving party must go beyond the pleadings and, by citing affidavits or "'depositions, answers to interrogatories, and

4

admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting former Fed. R. Civ. P. 56(c), (e) (1986)).

In reviewing a summary judgment motion, the Court "must draw all justifiable inferences in favor of the nonmoving party." *United States v. Carolina Transformer Co.*, 978 F.2d 832, 835 (4th Cir. 1992) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). A mere "*scintilla* of evidence," however, will not preclude summary judgment. *Anderson*, 477 U.S. at 251 (quoting *Improvement Co. v. Munson*, 81 U.S. (14 Wall.) 442, 448 (1872)). "[T]here is a preliminary question for the judge, not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party . . . upon whom the onus of proof is imposed." *Id.* (quoting *Munson*, 81 U.S. at 448).

In support of the their Motion for Summary Judgment, the Correctional Defendants submitted, among other things: the affidavit of Nurse Dabney (ECF No. 88-1); the affidavit of T. Puryear, the Assistant Warden of Deerfield Correctional Center ("Deerfield") (ECF No. 90); the affidavit of C. Sherrill, the Grievance Coordinator at Deerfield (ECF No. 88-3); the affidavit of S. Johnson, the Manager of the VDOC Correspondence Unit (ECF No. 88-4); Defendant Clarke's Response to Plaintiff's Interrogatories (ECF No. 88-5); Defendant Miller's Response to Plaintiff's Interrogatories (88-6); Defendant Herrick's Response to Plaintiff's Interrogatories (ECF No. 88-7); Defendant Amonette's Response to Plaintiff's Interrogatories (ECF No. 88-8); Defendant Oates's Response to Plaintiff's Interrogatories (ECF No. 88-9); and, Defendant Harris's Response to Plaintiff's Interrogatories (ECF No. 88-10).

In support of their Motion for Summary Judgment, the Medical Defendants have submitted: Phoenix's Medical Records (ECF No. 97-1); the Declaration of Dr. Harris (ECF No. 97-2); the Declaration of Dr. Sharma (ECF No. 97-3); the Declaration of Nurse Schnur (ECF No.

97-4); a timeline of Dr. Harris's treatment of Phoenix (ECF No. 97-5); a timeline of Dr. Sharma's treatment of Phoenix (ECF No. 97-6); a timeline of APRN Marinos's treatment of Phoenix (ECF No. 97-7); a timeline of RN Powell's interactions with Phoenix (ECF No. 97-8); a timeline of Nurse Stith's interactions with Phoenix (ECF No. 97-9); and, the Declaration of Dr. Henceroth (ECF No. 97-10).

### III. Phoenix's Opposition to the Motions for Summary Judgment

Phoenix has opposed the Motions for Summary Judgment by filing, among other things: (1) multiple Responses to the Motions for Summary Judgment (ECF Nos. 94, 105); (2) a Motion to Stay (ECF No. 106); (3) a Motion for Discovery and Issuance of Subpoenas (ECF No. 108); and, (4) a Motion to Appoint Counsel (ECF No. 110).[7] As explained below, Phoenix again has misrepresented the facts, ignored the relevant rules governing his submissions, and specifically disregarded the directives of the Court. *See, e.g., Jamison v. Clark*, No. 3:22CV425, 2024 WL 251927, at *1 (E.D. Va. Jan. 23, 2024) ("*Jamison I*") (finding that Phoenix "disregarded the Court's orders, provided knowingly false information, and realleged claims against defendants that previously had been dismissed with prejudice by the United States District Court for the Western District of Virginia") *aff'd sub nom. Jamison v. Dotson*, No. 24-6132, 2024 WL 3220310 (4th Cir. June 28, 2024).

### A. Phoenix Regularly Ignores Court Rules and Orders

The Court's evaluation of Phoenix's current conduct does not occur in a vacuum. Two years ago, the Court noted that although Phoenix is appearing *pro se*, "he is a sophisticated litigant." *Jamison I*, 2024 WL 251927, at *7. The Court found that, "Jamison has an expansive history of unnecessarily protracting litigation by improper complaints and ignoring the Court's

---

[7] The Medical Defendants' Motion for Leave to File a Consolidated Response (ECF No. 112) to Phoenix's motions will be GRANTED.

directions." *Id.* at \*8. The Court found that Phoenix's "conduct in the present action alone stands as a testament to his inclination to ignore the Federal Rules of Civil Procedure, the Court's orders, and to proceed in manner of his own choosing." *Id.* As explained below, in the present action, Phoenix continues to exhibit this noncompliant behavior.

Since filing *Jamison I*, Phoenix filed many more actions in this Court. *See id.* (citing cases). Therefore, when the Court docketed the present action, the Court informed Phoenix that, "[e]ach submission must bear the appropriate civil action number for the case to which it pertains." (ECF No. 3 ¶ 8.) The Court further warned Phoenix that he could not submit a single response or motion listing multiple cases. (*Id.*)[8] As discussed below, Phoenix simply disregarded that directive.

## B. Phoenix's Submissions Listing Multiple Cases

Phoenix has submitted a Motion to Stay, Motion for Discovery and Issuance of Subpoenas, and two duplicate Motions for Appointment of Counsel that bear the civil action number for the present action and also cases 3:23cv276,[9] 3:23cv316, 3:23cv335, and 3:23cv357. (ECF No. 106, at 1; ECF No. 108, at 1; ECF No. 110, at 1.) He has submitted a copy of these motions for each of his cases. Once again, Phoenix has chosen to ignore the Court's orders and proceed in his preferred manner. The motions contain information that is inaccurate and irrelevant to this present action. Phoenix's disregard of the Court's directives regarding filing

---

[8] The Court warned Phoenix that if he "attempts to submit one response [or motion] listing a group of case numbers, the Court will only docket that submission in the first-listed civil action on that submission. The Court will not consider the submission as a response in any other civil action." (ECF No. 3 ¶ 8.) With reluctance, however, the court must find that given the posture of this action, it would unduly protract the proceedings to require Phoenix to refile his motions in an appropriate manner.

[9] Phoenix transposed the numbers for this case, as "3:23cv267." He does not have a case with that case number.

individualized motions for each separate civil action provides sufficient grounds for denying each of the motions.  Accordingly, the motions (ECF Nos. 106, 108, 110) will be DENIED on that basis alone.  Nevertheless, in this instance, the Court will provide a further individualized discussion of each motion below and the Court's reasons for denying that motion.

In his Motion to Stay, Phoenix requests that the Court stay further proceedings in this matter pending the resolution of his Motion for Discovery and Issuance of Subpoenas and Motion for Appointment of Counsel.  (ECF No. 107, at 1.)

In his Motion for Discovery and Issuance of Subpoenas, Phoenix states that, "[i]n each case, the Court has denied Phoenix discovery and production of requested documents.  The Defendants have further denied and not proffered critical documents they are obligated to provide under the Court's Rules for Discovery despite several requests from the plaintiff."  (ECF No. 109 ¶ 3.)  Phoenix goes on to note that he has received copies of his medical records, in the present action, but they are somehow incomplete.  (ECF No. 109 ¶¶ 7, 8.)  In his Memorandum in Support of his Motion to Stay, Phoenix references this present action and states, "no discovery has been permitted."  (ECF No. 107, at 3–4.)

Phoenix's assertion that he has been denied all discovery in this matter is plainly false.  As reflected above, the Correctional Defendants' Motion for Summary Judgment contains scores of pages reflecting the Correctional Defendants' responses to Phoenix's Interrogatories.  (ECF Nos. 88-5 through 88-10.)  The Medical Defendants assert that Phoenix has not served any discovery requests upon them in this case, but that they have responded to Phoenix's discovery requests in other cases related to his medical issues.  (ECF No. 113, at 3 n.2.)  Additionally, in response to the Correctional Defendants' Motion for Summary Judgment, Phoenix submitted

8

almost 800 pages of medical records, grievance records, letters to VDOC staff, VDOC investigative records, and VDOC policies and procedures. (ECF Nos. 94-1 through 94-7.)

### C. Motion for Discovery and Issuance of Subpoenas

In *pro se* prisoner cases, such as this, "there is no prohibition on the immediate availability of discovery upon the commencement of the case." *Smith v. Rollins*, No. 3:16CV293-HEH, 2019 WL 13418468, at *1 (E.D. Va. Jan. 29, 2019) (quoting *Awan v. U.S. Dep't of Justice*, No. 101100 (BAH), 2011 WL 2836555, at *1 (D.D.C. July 13, 2011)). Phoenix has been provided an unfettered opportunity to conduct discovery in the present action and has taken advantage of many opportunities. He fails to articulate any basis, limited to the particulars of this action, explaining why an order from the Court pertaining to discovery is necessary. Further, with respect to his vague request for issuance of subpoenas, Phoenix fails to clearly articulate to whom he wishes the subpoenas be issued and what documents he requires.[10] Accordingly, Phoenix's Motion for Discovery and Issuance of Subpoenas (ECF No. 108) will be DENIED.

### D. Motion to Stay

"[S]ummary judgment should only be granted 'after adequate time for discovery.'" *McCray v. Maryland Dep't of Transp., Maryland Transit Admin.*, 741 F.3d 480, 483 (4th Cir. 2014) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). As noted above, Phoenix has had ample time to conduct discovery. Nevertheless, "when a party lacks material facts necessary to combat a summary judgment motion, [the party] may file an 'affidavit or declaration that, for specified reasons, [the party] cannot present facts essential to justify its

---

[10] The pertinent Local Rule states: "Parties appearing *pro se* may apply for subpoenas in their own behalf. All such requests by such party must be accompanied by a memorandum setting forth the names and addresses of witnesses or the documents requested and why and for what purpose or purposes." E.D. Va. Loc. Civ. R. 45(A).

opposition.'" *Id.* (second alteration in original) (quoting Fed. R. Civ. P. 56(d)). "The threshold showing to support a Rule 56(d) motion is low." *Escobar-Salmeron v. Moyer*, 150 F.4th 360, 369 (4th Cir. 2025). Nevertheless, the party seeking a stay pursuant to Fed. R. Civ. P. 56(d), must "specifically allege why the information sought would [be] sufficient to create a genuine issue of material fact such that it [could] defeat[] summary judgment." *Strag v. Bd. of Trs.*, 55 F.3d 943, 954 (4th Cir. 1995). Mere "[v]ague assertions" that more discovery is needed are insufficient to warrant a stay or the denial of a motion for summary judgment. *Escobar-Salmeron*, 150 F.4th at 372 (alteration in original) (quoting *Nguyen v. CNA Corp.*, 44 F.3d 234, 242 (4th Cir. 1995)).

Here, Phoenix has not identified any specific information that he needs in discovery, much less explained how such information would be sufficient to defeat the Motions for Summary Judgment filed in this case. Instead, Phoenix has untruthfully stated, "no discovery has been permitted." (ECF No. 107, at 3–4.) Later, Phoenix acknowledges that Defendants have responded to his requests for discovery, but vaguely suggests those responses were incomplete.

> In case 615, Phoenix requested documents in his opening brief and was denied by the Court and Phoenix requested discovery in ECF 30 but was denied by this court in ECF 39. The court went right to motions to dismiss and summary judgement motions without discovery. The defendants requested cloned discovery in ECF 70 and was granted in ECF 80 but never shared with the Plaintiff. No discovery for the Plaintiff which has happened in this case despite Phoenix requesting VADOC medical records, VADOC grievance files, VACORIS[11] electronic filed, investigation reports which are needed to defend any summary judgment motions.

(ECF No. 107, at 8.) The record reflects that the Correctional Defendants have responded to Phoenix's discovery requests. Given the hundreds of pages of medical records, grievance records, letters to VDOC staff, VDOC investigative records, and VDOC policies and procedures

---

[11] VACORIS is "the VDOC's inmate information management system." *Thomas v. Dotson*, No. 7:25-CV-00109, 2025 WL 3215169, at *2 (W.D. Va. Nov. 18, 2025).

(ECF Nos. 94-1 through 94-7) that Phoenix has filed in this case, his vague allegations that discovery was incomplete are not sufficient to stay summary judgment. Phoenix has had ample time to alert the Court and Defendants to a specific document that is missing or that was not provided and he has not done so. Further, Phoenix fails to articulate with specificity the content of any omitted document that would demonstrate any of the Defendants turned a blind eye to his need for medical care. Rather than a legitimate attempt to delay summary judgment while Phoenix pursues evidence in support of his claims, the Motion for a Stay is an improper attempt to delay the proceedings with false and unsubstantiated allegations. Accordingly, the Motion for a Stay (ECF No. 106) will be DENIED.

### E. **Motion for Appointment of Counsel**

The United States Court of Appeals for the Fourth Circuit has stated

> that a district court must conduct a fact specific, two-part inquiry to assess whether a case presents exceptional circumstances before it decides whether to appoint counsel. [*Whisenant v. Yuam*, 739 F.2d 160, 162 (4th Cir. 1984)]. That inquiry requires the court to determine (1) whether the plaintiff "has a colorable claim" and (2) considering the claim's objective complexity and the plaintiff's subjective abilities, whether the plaintiff "lacks the capacity to present it." *Id.* If both questions are answered affirmatively, the case presents exceptional circumstances. *Id.*

*Jenkins v. Woodard*, 109 F.4th 242, 247 (4th Cir. 2024). Phoenix has presented colorable claims, so the analysis of his Motion for Appointment of Counsel focuses on considering his claims' objective complexity and Phoenix's subjective abilities, i.e., whether he lacks the capacity to present his claims. The claims in the present action are not particularly complex. Indeed, in his Complaint, Phoenix acknowledges that, "[t]his case is not complicated." (ECF No. 1, at 15.) Phoenix's submissions, including his successful pursuit of discovery, reflect that he is more than competent to litigate those claims. Therefore, the appointment of counsel is not necessary. Further, as he has done in his prior motions, Phoenix falsely insists that he has been denied the

11

opportunity to conduct discovery. (*See* ECF No. 111, at 7.) The Court notes that "the assistance of a pro bono lawyer in civil litigation is a privilege." *Cartwright v. Silver Cross Hosp.*, 962 F.3d 933, 937 (7th Cir. 2020) (citing *Pruitt v. Mote*, 503 F.3d 647, 649 (7th Cir. 2007)). "The valuable help of volunteer lawyers is a limited resource. It need not and should not be squandered on parties" whose very request for counsel reflects a lack of candor regarding the need for appointing counsel. *Dupree v. Hardy*, 859 F.3d 458, 462–63 (7th Cir. 2017). The Motion for Appointment of Counsel (ECF No. 110) will be DENIED.

## F. **Phoenix's Responses to the Motion for Summary Judgment**

In order to ensure that the parties shoulder their respective burdens for a motion for summary judgment, Local Rule 56(B) requires that:

> Each brief in support of a motion for summary judgment shall include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed. A brief in response to such a motion shall include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and *citing the parts of the record relied on to support the facts alleged to be in dispute.* In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion.

E.D. Va. Loc. Civ. 56(B) (emphasis added). Here, the Correctional Defendants and the Medical Defendants complied with the requirements of Local Rule 56(B). (*See* ECF No. 88, at 2–11; ECF No. 97, at 5–15.)

In Phoenix's Response to the Correctional Defendants' Motion for Summary Judgment, he does not include a separately captioned listing all the facts in dispute. Instead, he just spins his own narrative and titles it "Statement of Facts." (ECF No. 94, at 4 (emphasis omitted).) This

section generally fails to provide any useful citation to the record to support the facts alleged in this section. (ECF No. 94, at 4–18.)[12]

In his Response to the Medical Defendants' Motion for Summary Judgment, Phoenix once again failed to *respond* to Defendants' Statement of Undisputed Facts. Instead, Phoenix included his own "Statement of Undisputed Facts." (ECF No. 105, at 6 (emphasis omitted).) Phoenix once again fails to provide any useful citation to individual documents to support his Statement of Undisputed Facts. (ECF No. 105, at 6–24.) Therefore, the Court can generally assume the facts identified by the Correctional Defendants and the Medical Defendants in their Statement of Undisputed Facts are admitted. E.D. Va. Loc. Civ. R. 56(B).

Phoenix attached 784 pages of documents to his Response to the Correctional Defndants' Motion for Summary Judgment. (ECF No. 94-1 through 94-7.) Phoenix attached 621 pages of documents to his Response to the Medical Defendants' Motions for Summary Judgment. (ECF No. 105-1 through 105-4.) His accompanying briefs, however, again largely fail to provide any useful citation to these documents. Where the briefs accurately cite to a document the Court will consider it. However, "Rule 56 does not impose upon the district court a duty to sift through the

---

[12] Phoenix's failure to comply with Local Rule 56(B) and his unhelpful lack of citation cannot be excused simply as the omission of an inexperienced litigant. More than four year ago, the Court informed Phoenix of the requirements of that Local Rule and that it requires precision in citation to the record:

> Jamison often does not provide any helpful citation to the documents he relies upon to oppose summary judgment. Instead, he broadly contends that his "medical records" and "other documentation" demonstrate that summary judgment is not appropriate. During the course of this litigation, Jamison has submitted hundreds and hundreds of pages of records. The Court is neither obliged, nor inclined, to sort through documents in the first instance to ascertain whether there exists a material dispute of fact.

*Jamison v. Kincaid*, No. 3:19CV19, 2021 WL 4199997, at *5 (E.D. Va. Sept. 15, 2021) (citations omitted).

record in search of evidence to support a party's opposition to summary judgment." *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994) (quoting *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915 n.7 (5th Cir. 1992)). Rather, "[t]he court need consider only the cited materials . . . ." Fed. R. Civ. P. 56(c)(3); *see Murthy v. Missouri*, 603 U.S. 43, 67 (2024) (alterations in original) (observing that "[j]udges are not like pigs, hunting for truffles buried [in the record]" (quoting *Gross v. Cicero*, 619 F.3d 697, 702 (7th Cir. 2010))). Thus, the majority of Phoenix's submissions are of little use in deciding the propriety of summary judgment.

Phoenix attached his own declaration to his Response to the Correctional Defendants' Motion for Summary Judgment. ("Phoenix Decl.," ECF No. 94, at 44–48.) The facts offered by an affidavit or sworn declaration must be in the form of admissible evidence. *See* Fed. R. Civ. P. 56(c)(4). In this regard, the sworn statement "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* Therefore, "summary judgment affidavits cannot be conclusory or based upon hearsay." *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 962 (4th Cir. 1996) (internal citations omitted).

In his declaration, Phoenix has made numerous sworn statements that are of no value in assessing the propriety of summary judgment. *See United States v. Roane*, 378 F.3d 382, 400–01 (4th Cir. 2004) (internal quotation marks omitted) (citations omitted) (observing "[a]iry generalities, conclusory assertions[,] and hearsay statements [do] not suffice to stave off summary judgment"). For example, Phoenix swears:

> All administrative staff ignored my complaints and requests for help and ignored the risks of further harm which were proven by the extensive cervical procedure performed.
> Once all these officials were notified, they all had access to my medical records under their office authority to gain the facts of the lack of treatment but at

> no point did they do so by the lack of entry into my medical records that would have been done by staff under policy.
>
> Once all staff were made aware as they were, they all had access to the VACORIS system and could have seen my grievance file relating to the lack of medical care not just in this issue but over all for all my issues that received no proper care which would have warranted at the very least an inquiry but no inquiry was made as there is no entry in VACORIS that shows this.

(Phoenix Decl. ¶¶ 11–13 (paragraph numbers omitted).) Sworn statements of this ilk are of no use at the summary judgment stage. "Vague references to a group of 'defendants,' without specific allegations tying the individual defendants to the alleged unconstitutional conduct, do not raise a genuine issue of material fact with respect to those defendants." *Grieveson v. Anderson*, 538 F.3d 763, 778 (7th Cir. 2008) (citation omitted).

Phoenix swears that the surgical treatment that was finally provided to him in June of 2024 "was far more invasive than it had to be due to the lack of preventative treatments and therapy not provided by Deerfield staff or administrative staff . . . ." (Phoenix Decl. ¶ 15.) Phoenix is not competent to testify about the cause of any medical conditions, as he is not a medical expert. *Pearson v. Ramos*, 237 F.3d 881, 886 (7th Cir. 2001). Further, Phoenix may not interpret medical tests or give a "lay opinion" concerning medical issues. *Raynor v. Pugh*, 817 F.3d 123, 131 (4th Cir. 2016) (Keenan J., concurring) (explaining that a layperson's interpretation of medical tests or "speculation regarding the causes" of a condition "constitute conclusory and inadmissible lay opinion").

Given the foregoing principles and submissions, the following facts are established for purposes of the Motions for Summary Judgment. Given the sheer number of Defendants Phoenix has named, the Court provides some additional established facts, when discussing Phoenix's claims against the individual defendants.

## IV.  Summary of Relevant Facts

### A.  General Facts Regarding Phoenix

Phoenix's "medical history includes multiple diagnosed health issues, including anxiety, asthma, celiac disease, GERD, Barrett's esophagus, several food allergies, dermatitis, high blood pressure, an enlarged prostate, irritable bowel syndrome, obesity, chronic headaches, hearing loss, hemorrhoids, depression, diabetes, post-traumatic stress disorder, and Sjogren's disease." (ECF No. 97-4 ¶ 7.)  Phoenix was housed at Deerfield from August 2, 2019 until January 9, 2024.  (ECF No. 88-1 ¶ 3.)

With respect to his back and neck, "Phoenix's VDOC medical records reflect that he had a history of cervical/lumbar issues, which included surgical intervention dating all the way back to 2010 or 2011."  (ECF No. 97, at 6 n.5 (internal citation omitted).)

### B.  Phoenix's Initial Medical Complaints and Medical Care at Deerfield

On November 23, 2019, Phoenix "wrote an Informal Complaint in which he complained that he was experiencing headaches, tinnitus, and back pain, and was not receiving adequate pain management." (ECF No. 88-3 ¶ 5.)  Nurse Schnur

> responded to the Informal Complaint and told Phoenix that he had been evaluated by the on-site MD on August 15, 2019, August 27, 2019, September 18, 2019, and November 15, 2019; that he had been provided with Aleve; and that staff had received no further complaints of pain from him.  On December 2, 2019, Phoenix wrote a Regular Grievance in which he complained that he was not receiving adequate pain management and that Tylenol and Aleve do not fix the problem.  On January 2, 2020, a Level I grievance response was issued by Assistant Warden Oates deeming the grievance unfounded.  The only requests received from Phoenix were requests for medical copies and questions regarding lab test results, and he had not submitted a request to be seen by the doctor for his complaint that his pain management was inadequate.  Phoenix appealed the Level I grievance response to the Regional Administrator at Level II, where it was upheld.

(ECF No. 88-3 ¶ 5.)

16

### C. **Phoenix's Initial Interaction with the Medical Defendants and First MRI**

On January 18, 2020, Dr. Harris saw Phoenix in the clinic at Deerfield for his gluten free diet and issues with his hernia.  (ECF No. 97-2 ¶ 11.)  Phoenix also reported issues with "neck/moving around."  (ECF No. 97-2 ¶ 11.)

On January 31, 2020, Phoenix was seen by Dr. Henceroth.[13]  (ECF No. 97-2 ¶ 11.)  At this visit, Phoenix had complaints of right leg pain and lower back pain.  (ECF No. 97-2 ¶ 11.) "Dr. Henceroth diagnosed Phoenix with right L5 radiculopathy and recommended that Phoenix be referred to a neurosurgery clinic for evaluation."  (ECF No. 97-2 ¶ 11.)[14]

On February 2, 2020, Phoenix returned to the care of Dr. Harris, where he raised concerns, including neck pain.  (ECF No. 97-2 ¶ 11.)  Pursuant to Dr. Henceroth's recommendation, Dr. Harris made a referral for Phoenix for a neurosurgical evaluation.  (ECF No. 97-2 ¶ 11.)

On February 4, 2020, Phoenix requested an MRI, and that request was passed along to the medical doctor he saw that day.  (ECF No. 97-4 ¶ 13(a).)

On February 13, 2020, Dr. Harris made a referral for Phoenix to have an MRI for his lower back and neck.  (ECF No. 97, at 6.)

---

[13] Dr. Henceroth is a consulting, orthopedic physician, with a specialty in orthopedic surgery.  (ECF No. 97-10 ¶ 1.)  Dr. Henceroth states:

> For incarcerated patients such as Phoenix, I make treatment recommendations to be reviewed and implemented in the prison, but [he] could not issue orders. The actual ability to carry out the treatment recommendations, as well as the timing and manner in which these recommendations were carried out, were made in collaboration with the prison primary care providers.

(ECF No. 97-10 ¶ 3.)

[14] Because this visit was to an outside provider, Dr. Harris, as the Medical Director, reviewed this report.  (ECF No. 97-2 ¶ 11.)

17

> With regard to Phoenix's lumbar spine, the MRI revealed multilevel mild degenerative disc disease, most at L3-4 level with mild to moderate spinal canal and moderate bilateral neural foraminal stenosis. With regard to Phoenix's cervical spine, the MRI revealed multilevel mild degenerative disc disease with no significant spinal canal stenosis, cord compression, or signal changes, as well as mild right C2-C3, severe right C4-C5, mild to moderate right C5-C6, and mild right C6-C7 neural foraminal stenosis.

(ECF No. 97, at 6–7 (internal citations omitted).)

### D. COVID19 and Phoenix's Initial Neurosurgery Appointment with Dr. Rivet

On June 8, 2020, Dr. Harris referred Phoenix for a neurosurgery evaluation for his neck and back pain. (ECF No. 97-1, at 9.) Dr. Harris also ordered 325 mg of Tylenol twice per day with two refills. (ECF No. 97-1, at 9.)

On August 5, 2020, Dr. Harris noted that none of Phoenix's offsite appointments had been made because Phoenix had not signed the COVID-19 forms. (ECF No. 97-1, at 11.) Phoenix also stated he was on a hunger strike because he did not feel he was being provided with an appropriate diet. (ECF No. 97-1, at 11.)

On August 16, 2020, Dr. Harris ordered 7.5 mg of Mobic for Phoenix's headaches. (ECF No. 97-2 ¶ 11.) Dr. Harris also explained to Phoenix that Mobic should help with his neuropathic pain. (ECF No. 97-2 ¶ 11.) On September 23, 2020, Dr. Harris refilled Phoenix's prescription for Mobic, increased the dosage to 15 mg and extended the prescription for 120 days. (ECF No. 97-2 ¶ 11.)

Meanwhile, on September 12, 2020, Phoenix submitted a complaint that he was not receiving adequate care for his pain. (ECF No. 88-3 ¶ 6.) Specifically, on that date

> Phoenix submitted an Informal Complaint, in which he complained that he was not receiving proper pain management for his complaints of headaches and neck and back pain. Health Service Administrator G. Searleman responded to the Informal Complaint and advised Phoenix to place a sick call request if he wished to be seen prior to any scheduled follow-up. On September 21, 2020, Phoenix submitted a regular grievance in which he complained that he was not receiving proper

18

unimpeded medical care for neck and back pain and constant headaches. On October 24, 2020, Assistant Warden Oates issued a Level I grievance response in which he deemed the grievance unfounded. On investigation into Phoenix's claims, it was determined that Phoenix had been seen by the provider on September 23, 2020 and Mobic was prescribed for pain. It was determined that Phoenix had been receiving Mobic since September 28, 2020, but the medication was later discontinued due to the risk of GI bleeding and Phoenix's ongoing complaints of GI distress. The doctor recommended that Phoenix take Tylenol instead, and Phoenix agreed. Finally, Oates noted that the provider had advised Phoenix that medical staff could not fully eliminate his pain, but could help with managing the pain he experienced.

(ECF No. 88-3 ¶ 6.) Phoenix appealed that response to his grievance, which was upheld on appeal. (ECF No. 88-3 ¶ 6.)

On November 22, 2020, "Phoenix presented to medical reporting that his 'back went out' after lifting something. Phoenix rated his back pain as 7/10 and described it as a sharp stabbing pain. Phoenix claimed to have herniated discs. The nurse documented he was 'Able to walk without difficulty.'" (ECF No. 97-2 ¶ 11.) On November 27, 2020, Dr. Harris renewed Phoenix's prescription for Tylenol and learned of Phoenix's November 22, 2020 visit. (ECF No. 97-2 ¶ 11.)

On December 16, 2020, upon Dr. Harris's referral, Phoenix was seen by Dr. Dennis Rivet for a neurosurgery evaluation.[15] (ECF No. 97-2 ¶ 11.) The medical report from that visit reflects Phoenix could not identify a traumatic or inciting incident that gave rise to his neck and back pain but indicated his "symptoms [were] overall worsening over a period of years." (ECF No. 97-1, at 50.) Phoenix further stated that the "he has tried Flexeril with little relief. No nonsteroidals have been attempted. He has not performed physical therapy recently. He did have epidural steroid injections approximately 10 years ago, but found . . . little relief. He is

---

[15] Phoenix's medical record from that visit reflect that he was taking 650 mg of acetaminophen every four hours as need for pain, and 600 mg of ibuprofen three times a day as needed for pain. (ECF No. 97-1, at 50–51.)

19

open to trying them again." (ECF No. 97-1, at 50.) Dr. Rivet concluded, "based on his MRI scan and history, I would not recommend any surgical intervention. In terms of pain management, non operative measures such as physical therapy, consideration for lumbar epidural steroid injection, nonnarcotic pain medication are all reasonable options." (ECF No. 97-1, at 49.) Thus, contrary to Phoenix assertions, Dr. Rivet did not "order" physical therapy or epidural injections. (*See* ECF No. 105, at 9.) Rather, he merely proposed these treatments as possible methods to address Phoenix's complaints of pain. (ECF No. 97-2 ¶ 11.)

On February 7, 2021, Dr. Harris ordered 325 mg of Tylenol twice daily as needed for Phoenix's headache, neck, and back pain. (ECF No. 97-2 ¶ 11.)

### E. Renewed Complaints of Neck and Back Pain and Interactions with Dr. Sharma

Phoenix did not complain to the medical staff about neck or back pain again until November 19, 2021. (ECF No. 97-1, at 22.)[16] On that date, Phoenix told a nurse that he was experiencing back, ankle, and left arm pain. (ECF No. 97-1, at 22.) The majority of his complaints involved his ankle. (ECF No. 97-1, at 22.) The nurse referred Phoenix for a physician visit. (ECF No. 97-1, at 22.) When Phoenix saw Dr. Sharma later that same day, Phoenix did not express any complaints about neck or back pain. (ECF No. 97-1, at 23.) Instead, the visit focused on Phoenix's complaints related to his ankle and left arm. (ECF No. 97-1, at 23.) Dr. Sharma provided Phoenix with 500 mg of Tylenol and referred him to outside orthopedics. (ECF No. 97-1, at 23.)

On December 1, 2021, Phoenix wrote a complaint in which he stated "he had been sent to 'ortho' in the care center and that testing results and specialist reports were not present in his file

---

[16] Also on November 19, 2021, Phoenix submitted two Informal Complaints, wherein he stated the nurse had, *inter alia*, ignored his complaints of pain. (ECF No. 88-3 ¶¶ 7, 8.) Nurse Schnur responded, "I discussed the issue with you during your doctor appointment you are scheduled for the next clinic with ortho." (ECF No. 88-3 ¶¶ 7, 8.)

during this visit. Nurse J. Schnur responded that [Phoenix] had been seen by ortho." (ECF No. 88-3 ¶ 9.) This ortho visit, however, did not involve Phoenix's neck and back; rather it pertained to Dr. Henceroth's examination of Phoenix's elbow pain and partial bicep tear that are the subject of a separate lawsuit. (ECF No. 97-10 ¶ 24.)

On December 9, 2021, a medical note was entered indicating that Phoenix was refusing to do the treatment for his neck and back pain because his MCV notes were not in his chart. (ECF No. 97-1, at 21.)

On January 23, 2022, Dr. Sharma renewed Phoenix's Tylenol prescription and noted that he needed the 2020 lumbar and cervical spine MRI results for the records. (ECF No. 97-3 ¶ 9.) On January 24, 2022, Dr. Sharma reviewed the MRI results. (ECF No. 97-3 ¶ 9.) On February 16, 2022, Dr. Sharma saw Phoenix for his chronic care follow-up. (ECF No. 97-3 ¶ 9.) Dr. Sharma provided patient education, and ordered multiple lab studies, shoulder x-rays, discussed Phoenix's GI issues, and referred Phoenix to VCU Ortho for orthopedic surgical evaluation for his worsening back and neck pain. (ECF No. 97-3 ¶ 9.)[17]

On May 6, 2022, Phoenix returned to see Dr. Sharma for a follow-up care appointment and a chronic care visit. (ECF No. 97-3 ¶ 9.) Dr. Sharma noted that Phoenix still needed his neurosurgery appointment. (ECF No. 97-3 ¶ 9.) Dr. Sharma ordered additional MRIs of Phoenix's lumbar spine and cervical spine. (ECF No. 97-3 ¶ 9.)

---

[17] On March 23, 2022, Phoenix sent a letter addressed to Director Clarke, Dr. Amonette, Assistant Warden Oates, and other staff. (ECF No. 90, at 3–22.) In that lengthy letter, Phoenix primarily complained about his Celiac disease and medical diet, and also addressed other medical concerns. With respect to his neck and back, Phoenix complained that he had not received an epidural injection or physical therapy, sufficient pain medication, or a new mattress. Phoenix also complained that the on-site orthopedic doctor told him there was nothing wrong with his back. (ECF No. 90, at 3–22.)

On June 10, 2022, Phoenix returned to see Dr. Sharma. (ECF No. 97-3 ¶ 9.) Phoenix requested an ADA referral due to "not getting celiac diet." (ECF No. 97-1, at 27.) Dr. Sharma discussed Phoenix's ADA concerns and noted he was still waiting on MRI imaging he ordered on May 6, 2022. (ECF No. 97-1, at 27.) Phoenix told Dr. Sharma to "go f\*\*k yourself" and angrily left the appointment. (ECF No. 97-1, at 27.)

June 22, 2022 was Dr. Sharma's last day at Deerfield. (ECF No. 97-3 ¶ 9.)

On September 27, 2022, Phoenix wrote a letter to Warden Miller, Assistant Warden Oates, Operations Manager Harris, Director Clarke, Chief Physician Mark Amonette, and other VDOC staff and administrators, wherein he complained

> about the standard of medical care and the contract medical providers employed by VDOC and threatened to file a lawsuit. Phoenix stated that he was not receiving a proper gluten free diet for Celiac disease, that he had been waiting 9 months for an MRI for his neck and back, that he was not receiving adequate pain management, and other concerns.

(ECF No. 88-4 ¶ 6.)

## F. Phoenix's Second MRI

On November 7, 2022, Phoenix underwent the MRI imaging of his lumbar and cervical spine that previously had been requested. (ECF No. 97-2 ¶ 11.) The MRI of Phoenix's lumbar spine revealed "junctional spondylosis at L3-L4 with a comminuted retrolisthesis at that level; no spinal canal stenosis was demonstrated, but severe bilateral neuroforaminal encroachment was present." (ECF No. 97-2 ¶ 11.) Dr. Harris concluded all this was "consistent with chronic degenerative changes." (ECF No. 97-2 ¶ 11 (emphasis omitted).)

## G. **Second Neurosurgery Appointment**

On December 12, 2022, APRN Marinos referred Phoenix to Virginia Commonwealth University ("VCU") Ortho for a neurosurgery appointment and evaluation of Phoenix's lower back. (ECF No. 97-2 ¶ 11.) Dr. Harris approved the referral. (ECF No. 97-2 ¶ 11.)

On March 23, 2023, Phoenix filed a written complaint wherein he complained that it had been five months since the MRI of his back and neck, and he had not seen a specialist. (ECF No. 88-3 ¶ 10.) Nurse Powell responded and informed Phoenix that he was scheduled for a neurosurgery appointment. (ECF No. 88-3 ¶ 10.) Thereafter, on April 10, 2023, Phoenix submitted a grievance wherein he complained that it had been 5 months since his MRI and he had not been seen by a specialist. (ECF No. 88-3 ¶ 10.) The grievance was rejected at intake as a request for services. (ECF No. 88-3 ¶ 10.) Phoenix "was informed to confirm the appointment with the scheduler." (ECF No. 88-3 ¶ 10.)

On May 15, 2023, Phoenix submitted an informal complaint wherein he stated that medical continued to refer him to the onsite orthopedist even though that provider was providing no help for his arm, shoulder, and back. (ECF No. 88-3 ¶ 11.) On May 19, 2023, Nurse Powell responded, "You were seen and evaluated by provider and referred as appropriate. There is a scheduled appointment for VCU neuro." (ECF No. 88-3 ¶ 11.)

On June 14, 2023, Phoenix was finally seen for his VCU neurosurgery appointment with respect to his lower back. (ECF No. 97-2 ¶ 11.) Dr. Ward with VCU neurosurgery recommended obtaining an updated MRI of Phoenix's lower back and providing 25 mg of Lyrica twice a day. (ECF No. 97-1, at 56; ECF No. 97-2 ¶ 11.)[18] Dr. Ward noted that Phoenix's

---

[18] At the time of this visit, Phoenix's medical records indicate that he was on over twenty different medications, including Tylenol and Excedrin. (ECF No. 97-1, at 57–58.) With respect to the Tylenol, Phoenix was prescribed "1000 mg by mouth 3 times a day as needed for mild

November 2022 MRI "showed effusion but no evidence of any other significant surgical problem." (ECF No. 97-1, at 56.)[19]

### H. Third MRI and Neurosurgery Appointment and Physical Therapy Referral

On June 22, 2023, Dr. Harris referred Phoenix to Southhampton Memorial Hospital for MRI imaging of Phoenix's cervical spine. (ECF No. 97-2 ¶ 11.) On July 10, 2023, Phoenix underwent MRI imaging of his cervical spine. (ECF No. 97-2 ¶ 11.) The MRI revealed moderate multi-level degenerative changes, but no acute abnormalities. (ECF No. 97-2 ¶ 11.)

On July 17, 2023, Dr. Harris approved a request by Nurse Silvis-Root for Phoenix to return to VCU neurosurgery for his neck and back pain. (ECF No. 97-1, at 55.)

On August 19, 2023, Phoenix requested Lyrica. (ECF No. 97-1, at 37.) Dr. Singareddy reviewed Phoenix's cervical spine MRI and approved Phoenix's request for Lyrica. (ECF No. 97-1, at 37.) Dr. Singareddy noted that MRI of Phoenix's spine was normal and there was no indication for surgery at that time. (ECF No. 97-1, at 37.)

On September 27, 2023, Dr. Harris ordered that Phoenix's Lyrica prescription be renewed for thirty days at 25 mg twice daily. (ECF No. 97-1, at 36.)

On October 18, 2023, upon the referral from Dr. Harris, Phoenix presented to VCU Neurosurgery for an evaluation for his neck and pain. (ECF No. 97-2 ¶ 11.) "The consulting physician diagnosed Phoenix with lumbar radiculopathy, cervicalgia, and a left shoulder impingement" and recommended an orthopedic consultation, physical therapy, and a CT myelogram of Phoenix's lumbar spine. (ECF No. 97-2 ¶ 11.) The next day, per the

---

pain." (ECF No. 97-1, at 57.) With respect to Excedrin, he was prescribed to take it twice daily as needed. (ECF No. 97-1, at 57.)

[19] Phoenix contends that Dr. Ward ordered "physical therapy and epidural injections." (Phoenix Decl. ¶ 14.) However, the medical records from the visit Dr. Ward do not reflect any such order. (ECF No. 97-1, at 56–59.)

recommendation of the consulting neurosurgeon, Dr. Harris "referred Phoenix for physical therapy to treat his neck and back pain." (ECF No. 97-2 ¶ 11.) Dr. Harris also referred Phoenix to MCV Ortho for an orthopedic evaluation and CT myelogram to evaluate Phoenix's lumbar radiculopathy. (ECF No. 97-1, at 40; ECF No. 97-2 ¶ 11.)

I. **Phoenix's Final Interactions with Deerfield Medical Staff and Spinal Surgery**

On November 20, 2023, Phoenix underwent a CT myelogram of his lumbar spine. (ECF No. 97-2 ¶ 11.) The CT myelogram "[r]evealed intact hardware, minimal L3-L4 retrolisthesis and posterior disc space narrowing at that level; however, there was no instability between flexion and extension. Only mild degenerative changes were observed." (ECF No. 97-2 ¶ 11.) On November 20, 2023, Dr. Stich recommended that Phoenix's prescription for Lyrica be discontinued. (ECF No. 97-2 ¶ 11.)[20]

On January 9, 2024, Phoenix was transferred to St. Brides Correctional Center. (ECF No. 97-2 ¶ 11.) Prior to his departure, Phoenix never received the physical therapy for his neck and back that Dr. Harris had prescribed on October 19, 2023. (Phoenix Decl. ¶ 14.)

Sometime in 2024, Dr. Grerre took over Phoenix's medical care. (Phoenix Decl. ¶ 14.) In June of 2024, Dr. Grerre performed a cervical fusion of C3 through C7. (Phoenix Decl. ¶¶ 14, 15.) Following that surgery, Phoenix began to receive physical therapy. (*See, e.g.*, ECF No. 94-5, at 61, 74–76.)

---

[20] Phoenix swears that, "[e]verytime I was ordered pain management such as Mobic or even Lyrica facility medical providers stopped them." (Phoenix Decl. ¶ 5.) However, the records reflect Dr. Stich recommended that Phoenix's prescription for Lyrica be terminated (ECF No. 97-2 ¶ 11), and his prescription for Mobic was discontinued because it caused GI bleeding, (ECF No. 88-3 ¶ 6).

## V. Analysis

To survive a motion for summary judgment on an Eighth Amendment claim, a plaintiff must demonstrate: "(1) that objectively the deprivation of a basic human need was 'sufficiently serious,' and (2) that subjectively the prison officials acted with a 'sufficiently culpable state of mind.'" *Johnson v. Quinones*, 145 F.3d 164, 167 (4th Cir. 1998) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). Under the objective prong, the inmate must present evidence that demonstrates that the deprivation complained of was extreme and amounted to more than the "routine discomfort" that is "part of the penalty that criminal offenders pay for their offenses against society." *Strickler v. Waters*, 989 F.2d 1375, 1380 n.3 (4th Cir. 1993) (quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992)). "Only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003) (citation omitted).

The subjective prong of a deliberate indifference claim requires the plaintiff to demonstrate that a particular defendant actually knew of and disregarded a substantial risk of serious harm to his person. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). "Deliberate indifference is a very high standard—a showing of mere negligence will not meet it." *Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) (citing *Estelle v. Gamble*, 429 U.S. 97, 105–06 (1976)).

> [A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Farmer*, 511 U.S. at 837. *Farmer* teaches "that general knowledge of facts creating a substantial risk of harm is not enough. The prison official must also draw the inference between those

26

general facts and the specific risk of harm confronting the inmate." *Johnson*, 145 F.3d at 168 (citing *Farmer*, 511 U.S. at 837). Thus, to survive a motion for summary judgment under the deliberate indifference standard, a plaintiff "must show that the official in question subjectively recognized a substantial risk of harm . . . [and] that the official in question subjectively recognized that his actions were 'inappropriate in light of that risk.'" *Parrish ex rel. Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004) (quoting *Rich v. Bruce*, 129 F.3d 336, 340 n.2 (4th Cir. 1997)). "Importantly, a prison official 'who actually [knows] of a substantial risk to inmate health or safety may be found free from liability if [he] responded reasonably to the risk, even if the harm ultimately was not averted.'" *Short v. Smoot*, 436 F.3d 422, 427 (4th Cir. 2006) (alterations in original) (quoting *Farmer*, 511 U.S. at 844).

In evaluating a prisoner's complaint regarding medical care, the Court is mindful that, "society does not expect that prisoners will have unqualified access to health care" or to the medical treatment of their choosing. *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (citing *Estelle*, 429 U.S. at 103–04). "Deliberate indifference can be established by showing that the medical treatment was so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Overman v. Wang*, 801 F. App'x 109, 111 (4th Cir. 2020) (citing *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990)). Absent exceptional circumstances, an inmate's disagreement with medical personnel with respect to a course of treatment is insufficient to state a cognizable constitutional claim. *See Wright v. Collins*, 766 F.2d 841, 849 (4th Cir. 1985) (citing *Gittlemacker v. Prasse*, 428 F.2d 1, 6 (3d Cir. 1970)). Furthermore, "[i]t may not be seriously contended that any prisoner detained for however short a period is entitled to have all his needed elective medical care performed while in custody." *Kersh v. Bounds*, 501 F.2d 585, 589 (4th Cir. 1974).

27

Prior to turning to Phoenix's claims against the individual defendants, it is appropriate to address his general contentions that, while at Deerfield, Defendants acted with deliberate indifference with respect to his neck and back pain, by failing to: (1) provide him surgery for his neck and back; (2) provide adequate pain management, including epidural injections; (3) provide physical therapy; and, (4) promptly schedule MRI and neurosurgery evaluations. In addressing these contentions, the Court notes Phoenix had preexisting chronic back and neck problems prior to his arrival at Deerfield. Even after Phoenix underwent multiple rounds of diagnostic testing at Deerfield, no acute findings were observed, only chronic changes.

### A. Surgery

On December 16, 2020, Phoenix was seen by Dr. Dennis Rivet for a neurosurgery evaluation. (ECF No. 97-2 ¶ 11.) Dr. Rivet recommended against surgery at that time. (ECF No. 97-2 ¶ 11.)

On June 14, 2023, Phoenix was seen by Dr. Ward for another neurosurgery appointment. (ECF No. 97-2 ¶ 11.) Dr. Ward did not recommend surgery. (ECF No. 97-2 ¶ 11.) Dr. Ward recommended obtaining an updated MRI of Phoenix's lower back. (ECF No. 97-1, at 56; ECF No. 97-2 ¶ 11.) On August 19, 2023, Dr. Singareddy reviewed the updated MRI of Phoenix's spine, and concluded there was no indication for surgery at that time. (ECF No. 97-1, at 37.)

On October 18, 2023, Phoenix had another appointment with a neurosurgeon. (ECF No. 97-2 ¶ 11.) The consulting neurosurgeon did not recommend surgery. (ECF No. 97-2 ¶ 11.)

Phoenix fails to direct the Court to any evidence that any doctor concluded that that he required surgery for his neck and back while at Deerfield. Indeed, the doctors reached the opposite conclusion. Given the extensive testing provided and the multiple referrals to

28

neurosurgeons, Phoenix fails to demonstrate that any Defendant acted with deliberate indifference to his need for neck or back surgery while he was at Deerfield.

### B. Adequate Pain Management

Next, Phoenix insists Defendants acted with deliberate indifference because they failed to provide him with adequate pain management, including epidural injections. It is appropriate to first put to rest Phoenix's contention Dr. Rivet or Dr. Ward prescribed epidural injections. The relevant medical records do not reflect that Dr. Ward prescribed epidural injections. Furthermore, Dr. Rivet, merely suggested "consideration for lumbar epidural steroid injection" or "nonnarcotic pain medication" as "reasonable options" to treat Phoenix's complaints of pain (ECF No. 97-1, at 49.) Given that Phoenix acknowledged that he had tried "epidural steroid injections approximately 10 years ago" and found that failed to provide any significant relief (ECF No. 97-1, at 50), it was reasonable for Defendants to treat Phoenix's complaints of neck and back pain with nonnarcotic pain medication.[21]

The parties fail to direct the Court to a comprehensive record of the nonnarcotic pain medication Phoenix was provided while he was at Deerfield. What can be gleaned from the record was that Phoenix was regularly prescribed Tylenol to treat his pain. Additionally, beginning in August of 2020 and continuing through that Fall, Phoenix was provided with Mobic to treat his pain. (ECF No. 97-2 ¶ 11.) The Mobic eventually had to be discontinued because it contributed to GI bleeding in Phoenix. (ECF No. 88-3 ¶ 6.) Accordingly, after the termination of Mobic, on November 27, 2020, Dr. Harris renewed Phoenix's prescription for Tylenol. (ECF No. 97-2 ¶ 11.) And, on February 7, 2021, Dr. Harris ordered 325 mg of Tylenol twice daily as needed for Phoenix's headache, neck, and back pain. (ECF No. 97-2 ¶ 11.)

---

[21] Dr. Rivet also suggested physical therapy as another option to treat Phoenix's complaints of pain. (ECF No. 97-1, at 49.)

Phoenix did not complain of neck and back pain to the Medical Defendants again until November 19, 2021. (ECF No. 97-1, at 22.) This lapse certainly suggests that Phoenix had received adequate pain management during interval preceding this date. On November 19, 2021, Dr. Sharma provided Phoenix with 500 mg of Tylenol and referred to outside orthopedics. (ECF No. 97-1, at 23.) The parties fail to direct the Court to information pertaining to Phoenix's pain medication regime in the ensuing months. However, by the time of his June 2023 neurosurgery appointment, the record reflects that Phoenix was taking Tylenol, "1000 mg by mouth 3 times a day as needed for mild pain" and Excedrin, twice daily as needed. (ECF No. 97-1, at 57.)

Roughly two months after the neurosurgery appointment, on August 19, 2023, Phoenix began receiving Lyrica. (ECF No. 97-1, at 37.) Phoenix continued to receive Lyrica until his November 23, 2023 appointment with Dr. Stich. (ECF No. 97-1, at 44.) At that point, Dr. Stich stated,

> Would not recommend Lyrica with this patient, with the findings of peripheral lower extremity edema, weight problems, would recommend stopping HCTZ, especially with the abnormal enlarged cardiac shadow seen on CXR, patient is at risk for congestive heart failure, and Lyrica may be the cause of patient's cough, edema, and cardiac changes. Also with the patient's unusual skin changes, there is concern that patient may be at risk for hemangiosarcoma, and renal disease (elevated creatine). Would strongly recommend that Lyrica be discontinued. Intended to discuss with patient after CXR, but patient left AMA. Recommend discussing with him and stopping after discussion.

(ECF No. 97-1, at 44.) Clearly, the termination of Lyrica reflected concern for, rather than indifference to, Phoenix's health.

"It would be nice if after appropriate medical attention pain would immediately cease, its purpose fulfilled; but life is not so accommodating. Those recovering from even the best treatment can experience pain." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). The Eighth Amendment does not require "prison doctors to keep an inmate pain-free in the aftermath of

30

proper medical treatment." *Id.* So long as medical staff respond reasonably to an inmate's complaints of pain, the inmate's Eighth Amendment rights are not violated. *See Brown v. Harris*, 240 F.3d 383, 389–90 (4th Cir. 2001). That is the case here. The record shows that the Medical Defendants responded reasonably to Phoenix's complaint of pain. Their task was further complicated because of Phoenix's host of health problems. Both the Mobic and Lyrica had to be discontinued because, while apparently effective at easing Phoenix's pain, their continued use had deleterious effects on his overall health. Phoenix fails to direct the Court to a pain medication regime that was safe and had proven track record that the Medical Defendants ignored. Finally, Phoenix's complaints about adequate pain management must be evaluated against the backdrop of the medical care he was provided for his neck and back. Defendants repeatedly referred Phoenix to experts and ordered tests to attempt to diagnose and address the root cause of his pain. Phoenix fails to demonstrate Defendants acted with deliberate indifference to his need for pain management.

## C. Physical Therapy

As noted above, at his initial neurosurgery evaluation with Dr. Rivet on December 16, 2020, Dr. Rivet did not prescribe physical therapy; he merely suggested it as a possible option, along with nonnarcotic pain medication, to treat Phoenix's complaints of neck and back pain. The Medical Defendants proceeded to treat Phoenix's complaints of neck and back pain with medication. This was a particularly reasonable choice at the time given the restrictions imposed by the COVID-19 pandemic. Further, Phoenix did not complain of back and neck pain from February of 2021 until November of 2021.

31

On June 14, 2023, when Phoenix next had a neurosurgery appointment with respect to his lower back, Dr. Ward prescribed Lyrica and did not prescribe physical therapy. (ECF No. 97-1, at 56.)

On October 18, 2023, Phoenix had his next neurosurgery appointment, this time with Dr. Grerre. (ECF No. 97-1, at 42.) Dr. Grerre recommended an orthopedic consultation, physical therapy, and a CT myelogram of Phoenix's lumbar spine. (ECF No. 97-2 ¶ 11.) The next day, Dr. Harris "referred Phoenix for physical therapy to treat his neck and back pain." (ECF No. 97-2 ¶ 11.) Dr. Harris also referred Phoenix to MCV Ortho for an orthopedic evaluation and CT myelogram to evaluate Phoenix's lumbar radiculopathy. (ECF No. 97-1, at 40; ECF No. 97-2 ¶ 11.) While the CT myelogram occurred in November of 2023, Phoenix did not begin physical therapy prior to his departure from Deerfield on January 9, 2024. *See Walkers v. Peters*, 233 F.3d 494, 501 (7th Cir. 2000) (observing that in assessing a claim of deliberate indifference, the Court must also consider the totality of medical care provided, rather than simply the additional treatment the inmate was purportedly denied. (citing *Reed v. McBride*, 178 F.3d 849, 855 (7th Cir. 1999))).

Phoenix, however, fails to direct the Court to any evidence that he alerted Dr. Harris or any of the Defendants, that the physical therapy approved on October 18, 2023 had not been scheduled prior to his departure from Deerfield. Further, there is no evidence that any Defendant was otherwise aware the prescribed physical therapy had not been scheduled, much less that failure to do so would pose a substantial risk of serious harm to Phoenix's person. Accordingly, Phoenix fails to demonstrate Defendants acted with deliberate indifference to his prescribed physical therapy.

32

Furthermore, the Fourth Circuit has observed that:

> Medical care is often not immediate. Only the most fortunate are able to receive a doctor's appointment at the precise time they want it or medical attention at the very moment of arrival at a hospital. Waiting is often the name of the game. And actual treatment may not follow immediately upon medical attention, whether due to the caution of a prudent physician or the inevitable uncertainties of diagnosis. It would be wrong to turn the everyday inconveniences and frictions associated with seeking medical care into constitutional violations whenever they occur within the prison walls.

*Moskos v. Hardee*, 24 F.4th 289, 297–98 (4th Cir. 2022). Therefore, "[w]here a deliberate indifference claim is predicated on a delay in medical care, . . . there is no Eighth Amendment violation unless 'the delay *results* in some substantial harm to the patient.'" *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (quoting *Webb v. Hamidullah*, 281 F. App'x 159, 166–67 (4th Cir. 2008)). "[T]he substantial harm requirement may be satisfied by lifelong handicap, permanent loss, or considerable pain." *Shabazz v. Prison Health Servs., Inc.*, No. 3:10CV190, 2012 WL 442270, at *5 (E.D. Va. 2012) (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)). Here, Phoenix has not presented any competent evidence that demonstrates a delay in providing physical therapy resulted in substantial harm to his person.

### D. Delays in Scheduling MRIs and Neurosurgery Evaluations

There was often a significant delay between the recommendation that Phoenix receive an MRI or a neurosurgery evaluation and the time MRI or evaluation occurred. Phoenix has adduced no evidence that demonstrates the delay in MRIs or neurosurgery evaluations resulted in substantial harm to his person. Although Phoenix suggests that the delay in medical care required him to undergo a more intrusive spinal surgery when that surgery was eventually performed in June of 2024, no evidence supports that conclusion. Indeed, every neurosurgical evaluation and examination of MRIs while he was at Deerfield concluded that surgery was not warranted at that time. Phoenix fails to demonstrate that a more prompt MRI or neurosurgery

33

evaluation while he was at Deerfield would have resulted in a medical intervention that would have diminished his pain or eliminated the eventual need for surgery on his chronically decaying back and neck.

### E. Medical Defendants

With these larger medical issues resolved, the Court turns to Phoenix's claims against the individual Medical Defendants.

#### 1. Dr. Harris and Dr. Sharma

At all times relevant to Phoenix's claims, Dr. Harris was the Medical Director at Deerfield. (ECF No. 97-2 ¶ 7.) In that role, he provided direct patient care to Phoenix in addition to other administrative duties. (ECF No. ¶ 8.)

Dr. Sharma was a primary care physician at Deerfield until June 22, 2022. (ECF No. 97-3 ¶ 3.) Dr. Sharma provided medical care to Phoenix for his neck and back complaints, in addition to Phoenix's numerous other health issues. (ECF No. 97-3 ¶ 9.)

In his Complaint, Phoenix contends that Dr. Harris and Dr. Sharma, among other things, failed to: provide "timely or proper medical service[s]"; provide "timely access to medical testing"; "follow the orders of the neurosurgeon"; make medical records "available for specialists"; and, provide "adequate pain management." (ECF No. 1 ¶ 45.)

Phoenix has failed to present evidence to substantiate these allegations. The record reflects that Dr. Harris, Dr. Sharma, and the other medical providers, provided Phoenix with multiple rounds of medical tests, referrals to specialists, and were attentive to Phoenix's complaints of back and neck pain. Dr. Harris and Dr. Sharma swear that their "treatment decisions were reasonable, timely, and appropriate and were based on the patient's entire clinical picture at the time." (ECF No. 97-2 ¶ 13; ECF No. 97-3 ¶ 11.) Phoenix has directed the Court to

"no evidence that their diagnoses and treatment were not the product of [their] professional judgment or were 'blatantly inappropriate.'" *Grant v. Heidorn*, 802 F. App'x 200, 205 (7th Cir. 2020) (quoting *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014)). Contrary to Phoenix's suggestion, Dr. Harris and Dr. Sharma did not act with deliberate indifference because they did not employ every possible method to address his chronic pain suggested by Dr. Rivet. *See Holloway v. Delaware Cnty. Sheriff*, 700 F.3d 1063, 1074 (7th Cir. 2012). "[T]he prison physician, as the inmate's acting primary care doctor, is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards." *Id.* (citations omitted). Phoenix fails to demonstrate that either Dr. Harris or Dr. Sharma acted with deliberate indifference to his serious medical needs. All claims against Dr. Harris and Dr. Sharma will be DISMISSED.

## 2. **Dr. Henceroth**

In his Complaint, Phoenix complains that "[o]n 12/1/21 Phoenix was seen by Henceroth who did not have the MRI report and offered no treatment to Phoenix and simply stated Phoenix was getting old and just having some arthritis, despite knowing of the MRI due to previous diagnosis and referral for treatments." (ECF No. 1 ¶ 34.) Although Dr. Henceroth saw Phoenix on December 1, 2021, that visit had nothing to do with Phoenix's back and neck pain. (ECF No. 97-10 ¶ 24.) Rather, that visit pertained to Phoenix's complaints of elbow pain that are subject of a separate lawsuit. (ECF No. 97-10 ¶ 24.) Also, the MRI that Phoenix refers to is the MRI of his left elbow that was conducted on August 30, 2021. (ECF No. 97-10 ¶ 21.)

In his Complaint, he also states, "Phoenix went and saw Henceroth on 1/2/2022 and yet again no MRI report was provided to him and no treatments were again provided by Henceroth."

35

(ECF No. 1 ¶ 34.)  Phoenix did not see Dr. Henceroth on that date with respect to his back, neck or elbow.  (ECF No. 97-10 ¶¶ 24, 25.)

Dr. Henceroth, an offsite, consulting orthopedic surgeon, only saw Phoenix once, on January 31, 2020, with respect to Phoenix's neck and back pain.[22]  (ECF No. 97-1, at 47; ECF No. 97-2 ¶ 11.)  "Dr. Henceroth diagnosed Phoenix with right L5 radiculopathy and recommended that Phoenix be referred to a neurosurgery clinic for evaluation."  (ECF No. 97-2 ¶ 11.)  Phoenix fails to introduce any evidence that demonstrates Dr. Henceroth acted with deliberate indifference to his neck and back pain.  Accordingly, all claims against Dr. Henceroth will be DISMISSED.

### 3. APRN Marinos

Phoenix's primary complaint against APRN Marinos is that he failed to provide adequate pain management.  (ECF No. 1 ¶ 35.)  This charge fails to support a claim of deliberate indifference for the reasons stated above.  Additionally, Phoenix complains that APRN Marinos "further did nothing to aid Phoenix in getting [neurosurgery] appointment any quicker . . . ."  (ECF No. 1 ¶ 35.)[23]  As explained above, Phoenix fails to demonstrate that the delay in obtaining neurosurgery appointments resulted in any substantial harm to his person.  Phoenix fails to demonstrate that APRN Marinos acted with deliberate indifference to his back and neck pain.  Phoenix fails to demonstrate that APRN Marinos violated his rights under the Eighth Amendment.  All claims against APRN Marinos will be DISMISSED.

---

[22] Phoenix got the dates and the substance of his interactions wrong with respect to Dr. Henceroth in his Complaint.  (*See* ECF No. 97, at 24–25.)

[23] On December 12, 2022, APRN Marinos referred Phoenix to VCU Ortho for a neurosurgery appointment and evaluation of Phoenix's lower back, which Dr. Harris approved.  (ECF No. 97-2 ¶ 11.)

### 4. <u>Nurses Powell, Stith and Schnur</u>

With respect to Nurses Powell, Stith, and Schnur, Phoenix contends that they were at meetings, or responded to grievances, where his neck and back issues were discussed and still provided "no help." (ECF No. 1 ¶¶ 38, 39.) Phoenix also contends that Nurse Stith provided inadequate medical care. (ECF No. 1 ¶ 17.) With respect to these individuals, the record establishes the following additional facts.

Nurse Powell and Nurse Stith are registered nurses who had brief and limited interactions with Phoenix with respect to his back issues. (ECF No. 97-2 ¶ 8.) Nurse Stith and Nurse Powell were present at a multi-disciplinary team meeting on January 5, 2023, where Phoenix's medical issues, including Celiac disease and his neck and back pain were discussed. (ECF No. 97-8; ECF No. 97-9.)

Nurse Schnur was the Health Services Administrator ("HSA") at Deerfield. (ECF No. 97-4 ¶ 8.) This position "did not involve direct patient care." (ECF No. 97-4 ¶ 9.) Rather, her

> role was <u>administrative</u>, not clinical. In this role, [she] provided administrative oversight of the medical services at [Deerfield], which included overseeing healthcare staffing needs at [Deerfield], coordinating resources involved in the delivery of healthcare, ensuring compliance with applicable regulations affecting the delivery of healthcare at [Deerfield], and coordinating inmate medical services involving various disciplines.

(ECF No. 97-4 ¶ 8.) Further, she notes that she

> cannot make medical diagnoses, nor can [she] order diagnostic imaging studies, medications, make referrals, or make determinations on whether a surgical intervention or other treatment is needed. Treatment decisions are outside the scope of practice for a nurse, and so [she] did not and could not make treatment decisions for [Phoenix].

(ECF No. 97-4 ¶ 11.)

37

With respect to his neck and back pain, in addition to that stated above, Nurse Schnur's involvement with Phoenix was limited to the following instances:

On February 4, 2020, [Phoenix] requested an MRI, and that request was passed on to the medical doctor he saw that day.

On May 5, 2020, [Phoenix] indicated that he wanted to discuss lab results as well as his gastrointestinal, dermatological, and back issues. [Nurse Schnur] informed [Phoenix] that appointments were on hold because of the COVID-19 pandemic. At that time, [Phoenix] was scheduled to discuss his lab results and his request for a wedge pillow with his medical doctors.

On October 17, 2022, [Nurse Schnur] assisted in coordinating a multidisciplinary team meeting by telephone during which time [Phoenix] discussed his various health issues, including his neck and back pain.

On January 5, 2023, she assisted in coordinating a multidisciplinary team meeting in which [Phoenix's] neck and back pain, as well as his other health issues, were discussed. At that time, [Phoenix] was awaiting an appointment with neurosurgery to address his neck and back issues.

On October 31, 2023, when [Phoenix] was leaving medical, [Nurse Schnur] heard him state loudly, "You need to get me the f**k off this compound before something bad happens."

(ECF No. 97-4 ¶ 13 (paragraph identification omitted).) Nurse Schur did not obstruct Phoenix's care, rather she attempted to facilitate and coordinate for Phoenix. (ECF No. 97-4 ¶ 14.)

"While nurses may generally defer to instructions given by physicians, they have an independent duty to ensure that inmates receive constitutionally adequate care." *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) (citing *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010)); *see also Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 683 (7th Cir. 2012) (citation omitted) ("[A] nurse may not unthinkingly defer to physicians and ignore obvious risks to an inmate's health . . . ."). Phoenix fails to demonstrate these nurses obstructed his medical care or stood by while the treating physicians pursued a course of treatment that posed an obvious, substantial risk of serious harm to his person. Although there were some delays in obtaining testing or securing appointments with neurosurgeons, as discussed above, Phoenix fails to demonstrate the delays are attributable to these nurses, much less that the delays *resulted* in

38

substantial harm to his person. *Formica*, 739 F. App'x at 755 (quoting *Webb*, 281 F. App'x at 166–67). Because Phoenix fails to demonstrate Nurses Schnur, Powell, or Stith acted with deliberate indifference to his serious medical needs, all claims against them will be DISMISSED.

## F. **The Correctional Defendants**

"Harold Clarke was the Director of VDOC until September 2023." (ECF No. 88, at 1.) Clarke is not a medical professional, and as the Director of the VDOC he did not provide medical care or treatment to inmates. (ECF No. 88, at 1.)

Dr. Amonette was the VDOC's Medical Director and Chief Physician from 2013 until 2021. (ECF No. 88, at 1.) "He is currently the VDOC's Physician for Utilization Management." (ECF No. 88, at 1.) "In his role as Medical Director, Defendant Amonette was sometimes asked to review a case or grievance and provided advice and input. However, he did not have the authority to order an independently licensed medical practitioner to provide specific medical care to a patient." (ECF No. 88, at 2.)

At all times relevant to this action, Steve Herrick was the VDOC's Health Service Director. (ECF No. 88, at 2.) "Herrick is not a medical provider and does not personally intervene in inmate healthcare decisions. If made aware of complaints, he may assign the case to VDOC's Utilization Management physician or Chief Medical Officer for review and recommendations." (ECF No. 88, at 2.)

Darrell Miller has been the Warden at Deerfield since April of 2022. (ECF No. 88, at 3.) Warden Miller is not a medical professional. (ECF No. 88-6, at 6.) If complaints regarding an inmate's medical care are brought to his attention, he would refer the complaint to facility medical staff or to Health Services staff in VDOC's central administration to address. (ECF

39

No. 88-6, at 6.)  Warden Miller is not qualified to directly intervene in treatment decisions made by medical providers.  (ECF No. 88-6, at 6.)

Jerry D. Oates was the Assistant Warden at Deerfield at all times relevant to this action. (ECF No. 88, at 3.)  Assistant Warden Oates is not a medical professional and did not have authority to make decisions regarding Phoenix's medical care.  (ECF No. 88-9, at 2, 6.)

J. Harris was the Operations Manager at Deerfield from June of 2021 until April of 2024. (ECF No. 88, at 3.)  As the Operations Manager she did not have authority to make corrections to an inmate's care.  (ECF No. 88-10, at 2.)

The Correctional Defendants do not dispute the Phoenix sent letters or grievances to them about his back and neck issues.  (ECF No. 88, at 1; *see, e.g.,* Phoenix Decl. ¶¶ 8–10.)  And, in the case of Defendants Oates and Harris, they do not dispute attending meetings where Phoenix's medical issues were discussed.  (ECF No. 88, at 11.)  The Correctional Defendants, however, assert that Phoenix's medical complaints would have been forwarded to medical personnel for investigation and resolution.  (ECF No. 88, at 11.)

It is well-established that:

> If a prisoner is under the care of medical experts . . ., a nonmedical prison official will generally be justified in believing that the prisoner is in capable hands. This follows naturally from the division of labor within a prison.  Inmate health and safety is promoted by dividing responsibility for various aspects of inmate life among guards, administrators, physicians, and so on.  Holding a non-medical prison official liable in a case where a prisoner was under a physician's care would strain this division of labor.

*Iko v. Shreve,* 535 F.3d 225, 242 (4th Cir. 2008) (quoting *Spruill v. Gillis,* 372 F.3d 218, 236 (3d Cir. 2004)).  In light of the evidence discussed and addressed above, Phoenix fails to demonstrate that the Correctional Defendants acted with deliberate indifference by relying on the Medical

Defendants to provide appropriate medical care to Phoenix. Accordingly, all claims against the Correctional Defendants will be DISMISSED.

### VI. Dr. Singretti

In his Complaint, Phoenix named Dr. Singretti, the Regional Medical Director for Vital Core, the VDOC's medical contractor, as a defendant.[24] (ECF No. 1, at 1.) Phoenix contends that Dr. Singretti was "responsible for providing corrections to an inmate's medical care when he becomes aware that an inmate is not receiving proper medical services and to correct medical staff when they are not providing proper medical care to inmates." (ECF No. 1, at 1.) Other than the description of Dr. Singretti's job, Phoenix fails to provide any facts pertaining to Dr. Singretti's involvement in his medical care. Pursuant to the Prison Litigation Reform Act, this Court must dismiss any action filed by a prisoner at any time if the Court determines the action (1) "is frivolous" or (2) "fails to state a claim on which relief may be granted." 28 U.S.C. § 1915(e)(2); *see* 28 U.S.C. § 1915A. Phoenix fails to allege facts that plausibly suggest that Dr. Singretti acted with deliberate indifference to his neck and back pain. *See Potter v. Clark*, 497 F.2d 1206, 1207 (7th Cir. 1974) ("Where a complaint alleges no specific act or conduct on the part of the defendant and the complaint is silent as to the defendant except for his name appearing in the caption, the complaint is properly dismissed, even under the liberal construction to be given pro se complaints." (citing *U.S. ex rel. Brzozowski v. Randall*, 281 F. Supp. 306, 312 (E.D. Pa. 1968)). Accordingly, all claims against Dr. Singretti will be DISMISSED.

---

[24] Dr. Singretti has not been served or appeared in this action.

## VII.  Defendant Silvis

Under Federal Rule of Civil Procedure 4(m), Phoenix had 90 days to serve Defendants. Here, that period commenced on April 12, 2024. (ECF No. 11.)  More than 90 days have elapsed, and Phoenix had not served Defendant Silvis.  Therefore, by Memorandum Order entered on February 5, 2026, the Court directed Phoenix, within eleven (11) days of the date of entry thereof to show good cause why the action against Defendant Silvis should not be dismissed without prejudice.  Phoenix has not responded.  Accordingly, all claims against Defendant Silvis will be DISMISSED WITHOUT PREJUDICE.

## VIII.  Conclusion

The Medical Defendants' Motion to File a Consolidated Response (ECF No. 112) will be GRANTED.  Phoenix's Motion to Stay (ECF No 106), Motion for Discovery and Issuance of Subpoenas (ECF No. 108), Motion for Appointment of Counsel (ECF No. 110), and Motion for Court Ordered Mediation (ECF No. 85) will be DENIED.  Phoenix's request for injunctive relief will be DISMISSED AS MOOT.  The Motions for Summary Judgment (ECF Nos. 87, 96) will be GRANTED.  All claims against the Medical Defendants and the Correctional Defendants will be DISMISSED WITH PREJUDICE.  All claims against Dr. Singretti will be DISMISSED.  All claims against Defendant Silvis will be DISMISSED WITHOUT PREJUDICE.  The action will be DISMISSED.

An appropriate Final Order will accompany this Memorandum Opinion.

_____ /s/ _____
M. Hannah Lauck
Chief United States District Judge

Date: 3/23/2026
Richmond, Virginia

42